Filed 1/29/26  A.T. v. Superior Court CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

|  |  |
|---|---|
| A.T.,<br><br>        Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF SOLANO COUNTY,<br><br>        Respondent;<br><br>SOLANO COUNTY HEALTH & SOCIAL SERVICES DEPARTMENT,<br><br>        Real Party in Interest. | A174440<br><br>(Solano County<br>Super. Ct. Nos. J43097, J43098) |

A.T. (Mother) petitions this court for extraordinary writ review of a juvenile court order terminating reunification services and setting a selection-and-implementation hearing for her two children, a 15-year-old daughter (Older Sister) and a nearly 13-year-old son (Younger Brother).  She argues that the juvenile court should have returned the children to her care, that she did not receive reasonable reunification services, and that she also did not receive reasonable visitation.  We disagree and therefore deny her petition.

1

# I.
## FACTUAL AND PROCEDURAL
### BACKGROUND

Real party in interest Solano County Health & Social Services Department (Department) first became aware of the family when Younger Brother was born in February 2013, and the family was referred for general neglect. Mother was referred to parenting education, and the Department declined to initiate dependency proceedings. Someone reported the family to the Department later that same year and said Mother yelled frequently at then three-year-old Older Sister, but the Department found reports of emotional abuse to be unfounded. The Department investigated additional reports in 2014 and 2015, but the Department again determined that the reports were unfounded.

Later, in summer 2015, the Department filed a dependency petition after reports that Mother hit and pushed then five-year-old Older Sister. The juvenile court sustained allegations under Welfare and Institutions Code section 300,[1] subdivisions (b) (serious harm or illness) and (j) (abuse of sibling). The court ultimately placed the minors with Mother after the six-month review hearing, then terminated jurisdiction in July 2016.

Around three years later, in summer 2019, the Department again sought to detain the minors (then eight and six years old) after reports that Mother drove under the influence with them in the vehicle. The juvenile court ultimately sustained allegations under section 300, subdivision (b). The court returned the minors to Mother's care in January 2020 and terminated jurisdiction in April 2020 after reports that Mother participated in Alcoholics

---

[1] All statutory references are to the Welfare and Institutions Code.

2

Anonymous (AA), enrolled in DUI classes, and participated in mental-health services.

These current proceedings were initiated in April 2023 after the Department received reports that Mother physically abused Older Sister when she (Mother) was under the influence of alcohol, and that Mother had the minors (then 12 and 10 years old) blow into her breathalyzer in order to start her car on multiple occasions. The Department filed a dependency petition alleging that the minors were described by section 300, subdivision (b)(1) (failure to protect), based on Mother's substance-abuse problem and her physical abuse of Older Sister. The juvenile court ordered the minors detained from both Mother and their father,[2] and they were placed together in a foster home.

At the beginning of the proceedings, Mother was allowed weekly one-hour supervised visits with the minors, and the foster parent also monitored video- and phone-call visits. Mother informed the Department that this was insufficient time to spend with her children since she wanted an opportunity to make a positive impression and reduce any trauma from the separation. At a brief hearing in June 2023, Mother requested increased visitation and said her children were showing signs of distress from being separated from her. The juvenile court denied the request but granted the Department discretion to increase visitation and also to allow unsupervised visitation after observing Mother's behavior during supervised visitation. Mother

_____

[2] The minors' father reportedly lives in India, and he did not participate in proceedings below. The dependency petition alleged that the father had left the minors with no provision for support (§ 300, subd. (g)), an allegation the juvenile court sustained. The juvenile court terminated the father's reunification services at the six-month review hearing, and he is not a party to these writ proceedings.

3

asked again for increased visitation at another brief hearing later that month. She said that both the previous and current interventions in her family's lives caused trauma to the minors. The juvenile court again denied the request, stating it was early in the proceedings and that further observation was necessary.

Mother in July 2023 waived her right to a contested jurisdictional hearing and submitted on the social worker's report. She admitted a single allegation under section 300, subdivision (b), which the juvenile court found to be true. The count provided that Mother had a substance-abuse problem dating back to at least 2015 that impaired her judgment and ability to provide adequate care, support, and supervision for the minors. The count further provided that Mother becomes violent when she drinks alcohol, and she threatens to, and sometimes does, physically abuse the children, including punching and pushing them and pulling their hair, most recently in April 2023. Finally, the count provided that Mother admitted she had the minors blow into the breathalyzer installed in her car in order to start the vehicle, which happened most recently in April. The minors were ordered to remain in out-of-home placement with a foster parent. The juvenile court ordered reunification services. And Mother was to have a minimum of two hours of weekly, supervised visitation, and the social worker was granted discretion to eliminate supervision and to expand visitation to include overnight visits. A new social worker was assigned to the case the following month, in August 2023.

Mother was accepted into a dependency drug court in August 2023, but she was unsuccessfully terminated from the program in November after she declined to participate. An official with the program reported to a social worker that she was concerned that Mother was in denial about her drinking

and the fact it caused her to abuse the minors. The official believed Mother would benefit from family therapy and an intensive outpatient substance-use program.

According to a January 2024 status review report, Mother was in partial compliance with her case plan, and her progress toward alleviating the causes of out-of-home placement was minimal. She had connected with a psychologist, she had started therapy that month with a therapist she had previously worked with during a prior dependency case, she continued to submit to random drug testing, and she had completed a parenting-education program. Mother continued, however, to decline substance-use treatment despite such treatment being part of her case plan and having been referred to three outpatient programs. She told a social worker she did not want to participate in such a program because discussing alcohol "triggered" her, and she was "adamant" that she did not have an issue with alcohol abuse. Although Mother reported that she had been sober since the start of the current dependency proceedings, the Department was concerned that she was able to remain sober during the pendency of the previous two proceedings but had relapsed after those interventions ended. Mother had difficulty taking responsibility for her actions, according to the Department, and blamed the agency for its involvement and accused the Department of harming her children by separating them from her. She also declined to participate in a teen-parenting class recommended by the Department but said she would possibly be interested when her children were returned to her.

As for visitation, Older Sister reported that supervised visits were "stressful and chaotic" and that Mother had threatened that visits would stop altogether unless she (Older Sister) requested unsupervised visits, something Older Sister did not want. Social workers likewise reported that Mother

frequently argued with her children during visits, and the children physically fought during their time with Mother. The provider that supervised visits until early November 2023 stated it was no longer willing to provide the service because of "safety concerns." Visitation staff reported that Mother "guilt[ed]" the children for not calling her; criticized them about how they behaved; did not respect their boundaries; tried to discuss aspects of the legal proceedings and accused staff of " 'gaslight[ing]' the children" when they tried to redirect her, and denied that any abuse occurred; and told the children she was sorry they had " 'been brainwashed to think that I'm a monster.' " The minors expressed anger and resentment during visits about the abuse they suffered and the reasons for spending years "in and out of care," but Mother "continued to justify and downplay the abuse the children endured."

Following the six-month review hearing in March 2024, the juvenile court followed the Department's recommendation that the minors remain in out-of-home placement and that Mother continue to receive services. Mother was to continue to have two hours of weekly supervised visitation with the minors. The court also granted the social worker the discretion to return the minors to Mother's care with the provision of family-maintenance services. But the juvenile court denied Mother's request for unsupervised visits to begin at that time.

Mother and the minors had therapeutic visitation throughout 2024. Mother also participated in one-on-one parent coaching. The coach reported that Mother was able to articulate parenting information but was unable to apply the techniques. Instead, Mother would say that the Department was "brain washing her children and causing them trauma."

According to a June 2024 status review report, Mother was again in partial compliance with the requirement to participate in counseling/mental-

health services, substance-abuse services, and substance-abuse testing. And Mother continued to lack insight into the minors' trauma, and she did not take accountability for the effect her actions had on them. Although Mother had consistently attended visits, she had not progressed to unsupervised visitation since she had not engaged in substance-use services and refused to follow the Department's "Step Down Plan" to progress to unsupervised visits, and also because the children did not want increased visitation. The Department continued to be concerned that Mother had not accessed substance-use treatment services to address her alcohol use, which was the primary reason for dependency proceedings. The Department also was concerned that Mother minimized her history of alcohol use and the role it played in her children's trauma.

At the 12-month review hearing in August 2024, county counsel reported that Mother had completed a full assessment to do a relapse-prevention program. Based on that progress, the Department agreed that it was appropriate to transition to unsupervised visits every other week, with the other weekly visits remaining supervised. Mother's counsel argued that reasonable services were not provided to Mother during the reporting period, and he requested that the minors be returned to Mother or, in the alternative, that she be allowed to have overnight weekend visitation. As for Mother's participation in her case plan, the court observed that Mother had been referred to three different substance-abuse treatment programs but had declined to participate in such treatment. The court further observed that the Department had been trying to provide substance-abuse services but had been "stonewalled," had not been given all the necessary information, "and sometimes it looks like [Mother] is not willing to participate." The court further observed that "[t]he [D]epartment has been trying, as I can see, over

7

a period of time, since these children have been removed, to get the services to her that she needs. And each time, if she refuses, then they try to find something else that will meet her needs." The court found that the Department had provided reasonable services, that Mother "just has to cooperate more fully," and that "we are just taking those first steps towards the children being reunified." The juvenile court denied the request for weekend visits. But the court followed the Department's recommendation that Mother continue to receive reunification services. Mother did not appeal.

The social worker was out on an extended leave from approximately early September to mid-October 2024. When she returned, the social worker reviewed confirmation that Mother had completed a relapse-prevention program. But the social worker received little detail from Mother's service provider about specific skills Mother learned and how Mother implemented those skills in her daily life. And when the worker asked Mother if she had a written relapse-prevention plan, Mother said she was unsure. Mother also missed several therapy sessions in August and September 2024. Mother reported that she had a support system, but she told the social worker she did not want the worker to contact those support persons, which meant the Department was unable to verify the strength and involvement of Mother's network. Mother also continued to resist engaging in a sobriety-support network such as AA, and she again claimed that her participation would be detrimental to her sobriety and that AA meetings would be "triggering for her."

Neither child was reportedly interested in unsupervised visits. After the unsupervised visits began, the minors said they wanted to return to monitored visits since Mother's mood changed and she became irritable.

They were also concerned that although Mother "appear[ed] to be doing well, they fe[lt] it [was] 'all an act.'" The Department recommended in late October 2024 that reunification services be terminated.

The status-review report filed in early November 2024 stated that Mother "continue[d] to minimize [the minors'] trauma and believe[d] that what the children need to help their relationship is to return to her care." Younger Brother's therapist shared that the minor was not interested in family therapy and was not interested in reunifying with Mother because he felt she had not changed. The therapist also believed that Mother lacked insight into Younger Brother's trauma. Older Sister also did not want to reunify.

The social worker again went on an extended leave, for around two months from mid-December 2024 to mid-February 2025. During that time, the interim social-service supervisor and another social worker monitored the case.

The therapist who had provided weekly therapeutic visitation services for Mother and the minors for the previous year ended such visits in December 2024 as the family transitioned to unsupervised visits, and the family was to transition to family therapy. But then concerns were raised during an unsupervised visit in December 2024, when Mother yelled at the minors and blamed them for being removed from her care. The social worker overseeing the case in the assigned social worker's absence then recommended that therapeutic visitation continue.

The parties proceeded by way of argument at the 18-month review hearing in January 2025. The Department recommended providing three additional months of reunification services. Mother's counsel argued that reasonable services had not been provided since family therapy had not yet

been arranged despite Older Sister indicating the previous month that she was agreeable to it. The juvenile court granted the additional three months of services (§ 352), and it also granted the social worker the discretion to expand or restrict visitation, and also to return the children to Mother with the provision of family-maintenance services. Mother's counsel asked that the family receive at least one session of family therapy each month and that therapeutic visitation end, but the court specifically ordered that therapeutic visitation continue. The court also found that reasonable services had been provided. Mother did not appeal.

Visits continued, but not without problems. Family therapy had not been set up by late January 2025, apparently because Older Sister had not agreed to it. One therapeutic visit scheduled for that time was canceled because Mother refused to enter the visitation facility and insisted that the scheduled therapeutic visit be held outside. Mother's version of this incident differs, as she later attested that she went inside the facility despite her frustration that she had not been told in advance about having the meeting indoors and having hoped to take the children to get ice cream. She attended only one therapeutic visit between January and April despite having been ordered to participate in biweekly sessions. Mother said she did not consider therapeutic visits to be necessary and claimed they gave her panic attacks, despite not having previously raised this concern. She later attested that she "felt that going back to supervised visits would jeopardize the reunification progress, undermine my parental role, and have negative effects on the children." The minors' caregiver reported that the minors' behavior tended to worsen after visits that did occur, with Older Sister becoming "argumentative and disrespectful" and Younger Brother becoming aggressive toward his

10

sister.  Both minors consistently stated they did not want to be returned to Mother's care.

The social worker informed Mother in mid-April that family therapy was to begin the following day.  Mother accused the social worker of inflicting psychological damage and being unprofessional for informing her of the session at the last minute, and she requested a regular visit instead of family therapy.  She emailed the social worker and a supervisor that they were "TERRORIZING" her, and she said that she wanted a regular visit the following day and would start family therapy "NEXT TIME."  She also accused the Department of unnecessarily removing children from their parents' care in order to secure federal funding.  Mother ultimately attended the session, but Older Sister reported that Mother became upset with the therapist when asked to consider the family's challenges since she questioned why the therapist assumed there were issues to address.  Mother also reportedly took a 10-minute bathroom break during the session.  Mother canceled a family therapy session in mid-May because she was not feeling well, but she declined an offer to make up the session the following week.  Mother believed that an "independent therapist" should be working with the family, since the center the Department relied on for therapists "lack[ed] impartiality."[3]

The Department recommended in an April 2025 review report that Mother's reunification services be terminated.  The Department was

---

[3] As of a hearing held in mid-July, the family had had only three sessions because the assigned therapist was out for three to four weeks, and Mother declined to have another therapist during the absence.  Then the therapist left the services agency the Department had relied on, and the social worker testified she planned to reach out to another service provider to offer family therapy.

concerned about Mother's "escalated behavior, as she ha[d] demonstrated a tendency to quickly shift from calm to highly agitated."

A contested review hearing began in June 2025. The therapist who had worked with the family during therapeutic visitation in 2024 testified that the goal was to improve communication and the parent-child relationships. The therapist confirmed that Mother made progress over the course of therapeutic visitation.

The social worker testified there was a high degree of risk in returning the minors to Mother's care because of Mother's behavior and also because the minors were reluctant to be in her care. When asked about whether the children had been open to overnight visits with Mother, the social worker testified that the children believed Mother was "putting on an act for the [D]epartment and for the service providers" and that "behind closed doors, they don't see that change of behavior in [their] mom." The social worker said that although the Department was recommending that services be terminated to Mother, she would continue to have weekly unsupervised visits with the minors. The family likewise could continue family therapy under the minors' case plan.

Mother's therapist testified about the parenting skills he worked on with Mother and the positive results he had heard from her. The therapist recommended that the minors have overnight visits with Mother because she was sober and had been in the "maintenance stage of change for months and months and months."

Mother provided an offer of proof in the form of a declaration. She attested that she had been requesting family therapy, or for a psychologist or therapist to supervise visits, since around September 2023. Mother also declared that the people who supervised visits with her children did not allow

her to answer the minors' questions about dependency proceedings, which meant that they "were not allowed to discuss anything that the children were worried about" absent family therapy. Mother also recounted her difficulty in communicating with the social worker and problems coordinating visitation times and logistics with her. Mother said she ultimately requested that a new social worker be assigned to the case, after Younger Brother started saying disrespectful things to her (Mother) and misbehaved during visits that the social worker supervised. She further attested that she had "not thought about alcohol for a long period of time," and her "coping skills" were walking, getting plenty of sleep, engaging in outdoor activities, maintaining a positive mood, managing stress, and eating nutritious food. Mother acknowledged that she used to yell at the minors when she was overwhelmed, and she had worked on either removing herself from stressful situations or reacting more calmly.

After the close of evidence at a hearing in mid-July 2025, Mother's counsel requested that the juvenile court order an extended, weekend visit for the minors in Mother's home. After hearing argument from the other parties, the court ordered that an overnight visit occur before August 14.

An overnight visit took place in late July. The social worker and Mother both testified about the visit. The social worker informed Mother that she would be dropping off the children and was required to assess Mother's home to determine whether it was appropriate for an overnight visit. Mother was upset because the home had previously been assessed, and she accused the social worker of "causing trauma." When the social worker (accompanied by another worker) dropped off the children at Mother's home, Mother closed the door in their faces. (Mother denied "push[ing] the door on the social workers' faces.") When Mother eventually opened the door, she

said she was recording the social workers and told them she did not give permission for them to assess the home. After discussing the issue for a minute or two, Mother reluctantly agreed and let in the assigned social worker, but not the worker who had accompanied her. The social worker found the home to be safe for an overnight visit, then went to say good-bye. Mother then informed the social worker that she planned to take the minors out of town for the overnight. When the social worker asked Mother to provide information about where they were going, Mother told her she did not have to share the information. When the social worker left the home, she told Mother to "have a great day." Mother responded with words to the effect that the social worker should not have a good day.

The social worker ultimately reached out to county counsel about where Mother was taking the children, and Mother eventually texted the requested information to the social worker. Mother took the minors to Santa Cruz and they went to the beach. Mother returned the minors to their caregiver at 10:00 p.m. the following day, five hours later than the scheduled time. According to Mother, though, she gave the caregiver advance notice that the children would be returned later than previously scheduled, and she dropped them off at 9:00 p.m., not 10:00.

Both Mother and the minors reported to the social worker that the visit went well. But Older Sister said she only went on the visit because it was ordered by the court, and she said if she was returned to Mother's care she would go "AWOL." And Younger Brother said that even though the visit "went well that one time, he knows that [Mother] is portraying good behaviors because she knows that the courts are watching her; and that she did that in the past, in the past cases for the children to return [to her care]."

14

Counsel for the Department argued that reunification services should be terminated, and counsel for the minors agreed. Mother's counsel, by contrast, argued that the Department had not provided reasonable services over the previous six months. She argued that Mother should receive an additional six months of services or that the minors be returned to her care with supportive services in place.

The juvenile court found at a hearing in September 2025 that Mother did not "take true accountability for her actions consistent with blaming the Department and the children for CPS involvement." It found by a preponderance of the evidence that there was a substantial risk of detriment to the minors' safety and physical and emotional well-being were they to be returned to Mother. The court further found that the Department had provided reasonable services, terminated those services, and scheduled a selection-and-implementation hearing (§ 366.26). Mother was to continue to have weekly, unsupervised visitation for four hours, and the Department would have discretion to expand visitation.

## II.
### DISCUSSION

### A. Substantial Evidence Supports the Finding that Returning the Minors to Mother's Care Would Be Detrimental.

Mother first argues that the juvenile court erred when it declined to return the minors to her care under a plan of family maintenance. We are not persuaded.

Although services were extended past 18 months, the juvenile court treated the final hearing as an 18-month review hearing, and the parties agree we apply the statute that governs such hearings. The juvenile court at the 18-month hearing "shall order the return of the child to the physical custody of the parent . . . unless the court finds, by a preponderance of the

15

evidence, that the return of the child to their parent . . . would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.22, subd. (a)(1).) "That standard is construed as a fairly high one. [Citation.] It does not mean the parent in question is less than ideal, did not benefit from reunification services as much as we might have hoped, or seemed less capable than the available foster parent or other family member." (*M.G. v. Superior Court* (2020) 46 Cal.App.5th 646, 660.) The juvenile court may consider a parent's lack of insight in determining whether a child may safely be returned home. (*Georgeanne G. v. Superior Court* (2020) 53 Cal.App.5th 856, 865.) "We review the juvenile court's finding of detriment for substantial evidence. [Citations.] Under that standard we inquire whether the evidence, contradicted or uncontradicted, supports the court's determination. We resolve all conflicts in support of the determination, indulge in all legitimate inferences to uphold the findings and may not substitute our deductions for those of the juvenile court." (*Id.* at pp. 864–865.)

Substantial evidence supports the juvenile court's finding of detriment. In arguing to the contrary, Mother states that she "completed the court ordered case plan" and then highlights evidence favorable to her. When it issued its ruling, the juvenile court acknowledged that Mother had completed various aspects of her case plan and had made certain improvements. But based on the evidence, the court said it "appear[ed] that [M]other obtains the information necessary to check off the boxes in the case plan, but doesn't internalize or utilize what she learns unless it fits within her perception of what should happen because . . . true accountability would be to utilize what she has learned, recognizing the children's trust in her must be rebuilt. This is not done by blaming the social worker, blaming the children, threatening

16

to harm yourself, or discontinuing visits with the children." (See *In re Dustin R.* (1997) 54 Cal.App.4th 1131, 1141 ["mere completion of the technical requirements of the reunification plan" insufficient to overcome detriment finding].)

Even in her writ petition, Mother continues to place blame elsewhere. She cites to statements in the record that she did not blame the Department for the minors' removal from her care, but where she also said she blamed the agency for "other factors." In these proceedings, she highlights her belief, as expressed to the social worker in February 2025, that "the Department 'continues to be destructive to children's development, progress in reunification, and family bonding.'" And Mother also claims in her writ petition that she "had every right to become upset with a regression in her visits and services," a reference to restarting therapeutic visitation.

Where Mother highlights the evidence favorable to her, she "is less than candid in her interpretation of the record and the court's findings." (*In re Dustin R.*, *supra*, 54 Cal.App.4th at p. 1141.) She suggests that the juvenile court found she had not shown sufficient "behavioral changes," whereas the court in fact focused more on her lack of insight. And while she focuses heavily on the testimony of her therapist, Mother downplays her outbursts at her children during visitation, their reluctance to return to her care, and the juvenile court's assessment of her tendency to blame others for her situation. Given all the evidence supporting the juvenile court's detriment finding, we decline to set it aside.

*B. The Department Provided Reasonable Services to Mother.*

Mother also claims that the Department did not provide her with reasonable reunification services, including reasonable visitation. We are again unpersuaded.

At the 18-month review hearing, the juvenile court "shall determine by clear and convincing evidence whether reasonable services have been offered or provided to the parent." (§ 366.22, subd. (a)(3).) "The adequacy of reunification plans and the reasonableness of [the Department's] efforts are judged according to the circumstances of each case. [Citation.] Moreover, [the Department] must make a good faith effort to develop and implement a family reunification plan. [Citation.] '[T]he record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult.' " (*Amanda H. v. Superior Court* (2008) 166 Cal.App.4th 1340, 1345.) "Visitation is an essential component of any reunification plan." (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 972.) We review a finding of reasonable services for substantial evidence. (*Amanda H.* at p. 1346.)

In arguing that she did not receive reasonable services, Mother focuses primarily on the delay in providing family therapy from December 2024 to April 2025. In doing so, she downplays the fact that the juvenile court specifically ordered that therapeutic visitation continue after Mother's attorney requested in January 2025 that it be replaced with family therapy. The court specifically noted that, in light of the representations that Younger Brother was not comfortable with family therapy at that time, the court was "not going to place this child into family therapy only to traumatize him

18

further." Mother ignores this context when she argues in her petition that even if "he [Younger Brother] said he did not want to participate in family therapy, there is no evidence he would have refused the offer."

Mother contends that family therapy "finally commenced" in April 2025, but does not add the context that she objected to how it proceeded. The juvenile court noted that Mother wanted to choose her own therapist and did not want to begin therapy until the family spent more time together, then addressed Mother as follows: "I am confused because in testimony, in your paperwork, you have indicated in your declaration you had been wanting family therapy since the beginning of this matter. Then when family therapy was available, you decided you did not want to do it because it was not the person that you decided upon. And it is very clear in your own statements that you wanted an outside person." The court further observed that "reasonable services were provided, just not the way or by whom the mother wanted." This case is readily distinguishable from *T.J. v. Superior Court* (2018) 21 Cal.App.5th 1229, upon which Mother relies, where Division Four of this court found that a 10-month delay in providing individual therapy to a developmentally disabled parent was unreasonable. (*Id.* at p. 1244.)[4]

_____

[4] At the time the court issued *T.J.*, there was a split of authority over the available remedy when reasonable services had not been provided at the time of the 18-month hearing. (*T.J. v. Superior Court*, *supra*, 21 Cal.App.5th at pp. 1251–1257.) The Legislature has since amended section 366.22, subdivision (b)(2), to provide that if a child is not returned following the 18-month hearing and reasonable reunification services were not provided, the court shall extend services for an additional six months absent a finding of detriment to the child. (See Stats. 2023, ch. 438, § 2; see also *Michael G. v. Superior Court* (2023) 14 Cal.5th 609, 631, fn. 8 [disapproving *T.J.* for its statutory analysis regarding extending services, before amendment to statute].)

19

Finally, Mother complains that she was not afforded reasonable visitation, but she again mischaracterizes how visitation proceeded. She claims that therapeutic visits were reinstated in January 2025 "without warning," when in fact the juvenile court ordered that they continue. And while it is true that the Department weighed the minors' interest in family therapy when determining an appropriate time for it to begin, we disagree that the children had "total discretion" over whether any visitation occurred. Substantial evidence supports the juvenile court's determination that reasonable services, including reasonable visitation, were provided.

## III.
### DISPOSITION

Mother's petition for an extraordinary writ is denied on the merits. This opinion shall become final five court days after it is filed. (Cal. Rules of Court, rule 8.490(b)(2)(A).) This court's previous stay of the selection-and-implementation hearing shall be dissolved upon issuance of the remittitur.

_____

Humes, P. J.


WE CONCUR:


_____

Langhorne Wilson, J.


_____

Smiley, J.


*A.T. v. Superior Court*  A174440